IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



MAY 3 0 2012

| | | |
|---|---|---|
| UNITED STATES | ) | CASE NO.: 1:12mj363 |
| | ) | |
| v. | ) | **UNDER SEAL** |
| | ) | |
| MUFID KAMAL MRAD, | ) | |
| Also known as "Mark," | ) | |
| Defendant. | ) | |

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Peter W. Ashooh, after being duly sworn, depose and state as follows:

**A.    INTRODUCTION**

1.    I am a Special Agent with the Federal Bureau of Investigation (FBI) Washington Field Office and have been so employed since 1984. For the past ten years, I have been assigned to investigate terrorism matters. In this capacity I have received training and conducted investigations into both criminal and counter-terrorism matters. Prior to my current assignment and for the majority of my 28 years as an FBI Special Agent, I was involved in the investigation of money laundering and organized crime matters. I have personally conducted and also assisted other law enforcement officers with violent crime and money laundering investigations, and I am familiar with the operations of money laundering organizations. I have been involved in the undercover purchase of controlled substances, and have directed such purchases by confidential informants, cooperating individuals and police officers on numerous occasions, and I have participated in numerous surveillances, the execution of search warrants and the arrests of persons involved in violent crimes, drug trafficking activity, and illegal money laundering

activity.

2. This affidavit is based, in part, upon information provided to me by other agents, consensually recorded telephone calls, consensually recorded undercover face-to-face conversations, information provided by cooperating individuals, information obtained from a controlled bulk cash smuggling and money laundering undercover operation, physical surveillance, and other information gathered during the course of this investigation. This affidavit is submitted to support the criminal complaint and does not include each and every fact known to me concerning this investigation, but rather only the facts that I believe are necessary to establish probable cause for the issuance of the arrest warrant requested herein.

B. STATUTORY OFFENSES

3. MONEY LAUNDERING.

Section 1956 (a)(2) of Title 18, United States Code, provides, in part:

Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to . . . a place outside the United States (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity shall be sentenced to a fine of not more than $500,000 . . . or imprisonment for not more than twenty years, or both.

4. BULK CASH SMUGGLING

Section 5332 of Title 31, United States Code, provides, in part:

Whoever, with intent to evade a currency reporting requirement . . . knowingly conceals more than $10,000 in currency or other monetary instruments . . . in any conveyance . . . and transports or transfers, or attempts to transport or transfer such currency or monetary instruments from a place in the United States to a place outside the United States . . . shall be guilty of a currency smuggling offense and subject to . . . (b)(1) . . . [being] imprisoned for not more than five years.

C. **SUMMARY OF INVESTIGATION**

5. I am personally familiar with the facts of this case both from my own investigation and from information and evidence received by other law enforcement officials and witnesses. This affidavit contains information necessary to support probable cause for the attached criminal complaint charging MUFID KAMAL "Mark" MRAD with Attempted Money Laundering and Bulk Cash Smuggling for placing what he believed to be $100,000 in cash which he understood to be the proceeds of unlawful activity inside a used car and smuggling it to Lebanon in violation of 18 U.S.C. § 1956 (a)(2) and 31 U.S.C. § 5332.

6. A confidential source (CS-1) has been providing information on MUFID KAMAL "Mark" MRAD ( MRAD) to the FBI for six years. CS-1 has engaged in approximately ten consensually recorded telephonic and face-to-face conversations with MRAD. CS-1 was convicted of social security fraud in the Eastern District of Virginia in 2002, and was sentenced to probation. CS-1 has previously assisted the FBI in criminal investigations resulting in both indictments and convictions. CS-1 began assisting the FBI in September 2004. No promises have made to CS-1 in exchange for his assistance. CS-1 has been paid by the FBI, and received a financial payment upon completion of the investigations that resulted in convictions in 2007 and 2009. CS-1 also received assistance from the FBI to obtain his green card over the course of his work with law enforcement.

7. On or about May 30, 2008, MRAD and CS-1 met at MRAD's residence in Vienna, Virginia, within the Eastern District of Virginia (hereinafter referred to as MRAD's residence). CS-1 drove MRAD to an appointment in Washington, D.C., and they discussed the car export business and the idea of selling cars in Lebanon. CS-1 advised MRAD that there was a potential

customer in Lebanon. MRAD discussed giving an account number to transfer money and stated "we will take out some of yours, the cash, we will smuggle some of it. . . . Whatever we can smuggle, we will smuggle."

8. On or about June 25, 2008, MRAD and CS-1 met at MRAD's residence. CS-1 advised that he/she had spoken with an individual in Lebanon who wanted to send cash to Lebanon using the cars. CS-1 explained that the individual wanted to do a "test run" with money sent inside the car. MRAD then explained how to hide United States cash currency in a vehicle and that no machine could detect the money in the tires. MRAD stated that if the cash is old it needs to be vacuum packed to reduce its shipping size. MRAD further advised that if the money to be smuggled was comprised of twenties, it would reflect it was drug money. MRAD also expressed concern that they not handle counterfeit money and they needed to be careful. "[J]ust be careful. What, with this you could go to prison for life wherever you might be in the world." CS-1 stated that he/she would supply the vehicle.

9. On or about August 6, 2008, MRAD and CS-1 met at MRAD's residence. CS-1 advised MRAD that the person or people who were interested in smuggling cash out of the United States and into Lebanon were prepared to begin the process. MRAD advised that he was willing to assist in secreting the cash in a vehicle and making arrangements to have the vehicle shipped for CS-1. MRAD stated: "I told you last time, I am ready. How do you want to go about it? How much are they going to send?" CS-1 stated that the amount would probably be around $100,000 in United States currency. MRAD agreed that small amounts were a waste of time and that they could just"[p]ut them in your pocket and go to Lebanon!" MRAD explained that the most likely hiding location for the cash would be inside the tire of the vehicle, and that CS-1

would have to provide the vehicle. MRAD claimed that dogs cannot smell currency when it is hidden inside a car tire. MRAD explained that the money would be placed into the tires before the vehicle was taken to the port to put aboard a ship. CS-1 informed MRAD that the money was going to Lebanon. MRAD stated that he does not care where the money comes from, and that he knows lots of people who do it. MRAD advised CS-1 to make sure that the person who received the vehicle at the port in Lebanon was not being watched.

10. On or about January 14, 2010, CS-1 met MRAD at MRAD's residence. CS-1 advised that he/she had $100,000 that needed to be laundered and returned to Lebanon. MRAD responded that he could take the money out for CS-1 by plane. MRAD added that he used to move contraband, including money, through the Lebanese embassy via diplomatic pouch and was in turn receiving hashish from Lebanon in the same manner. MRAD added that if the amount was more than $100,000 he could have the money secreted inside a vehicle and have the car shipped to Lebanon. CS-1 advised that the method of secreting the cash inside a vehicle would be CS-1's preferred method. MRAD asked whether the cash would be "sealed" and CS-1 replied in the affirmative. MRAD stated "It's not a problem." MRAD explained that "what's a hundred thousand? It's nothing. A hundred thousand is nothing." MRAD stated that the bundles of currency "will be placed in the car in a spot where your creator would not suspect. Your father's father will not discover them." MRAD warned that if the money were "fake," they would both be in trouble. MRAD explained that how we do it is to purchase a vehicle, and then bring the vehicle to MRAD's house. MRAD stated they would then open the tires from "from one side only" and hide the cash inside the tires. MRAD then stated that the car would be then placed on a roll on, roll off type of ship to reduce the risk of scanning at the port. MRAD

advised that 10 percent was not enough, but agreed to that amount for the first shipment.

11.     On or about March 18, 2010, CS-1 met with MRAD at MRAD's residence concerning the smuggling of $100,000 in cash from the United States to Lebanon. CS-1 and MRAD discussed the logistics for secreting $100,000 in cash inside of a vehicle which will be provided by CS-1. MRAD advised that he would arrange to ship the vehicle via his affiliate. CS-1 showed MRAD one package wrapped in duct tape that CS-1 explained was $10,000 in cash. The package was one of ten packages wrapped in an identical fashion, totaling $100,000. CS-1 asked MRAD if the package was wrapped properly so that it could be hidden in a car for shipment overseas. MRAD stated that it "is excellent like this." MRAD asked if CS-1 had confirmed that the currency was not counterfeit to which CS-1 assured him it was real currency. CS-1 explained that he/she was certain the money was not forged given where it was going in Lebanon. MRAD replied that it's "going to Hamas."

12.     On or about March 26, 2010, CS-1 met with MRAD at MRAD's residence concerning the smuggling of what MRAD believed to be $100,000 in cash to Lebanon. MRAD advised that he had found "a new guy" who could smuggle currency into Beirut, Lebanon for them in the future for a 15% fee. CS-1 tells MRAD that is too much. MRAD explains that "[t]he Shiites are all sending the same way. . . . How do you think the money from Africa is getting to Beirut? What do you think, man? It is all the higher-ups. They're being paid money." MRAD stated that CS-1 could bring the vehicle in which the money would be secreted over to MRAD's house the following week. "The whole thing [actual task of secreting the cash bundles inside the vehicle] will take about an hour." MRAD explained that a "[f]ew days ago, I took a whole car apart. I checked for places that [the budles of currency] should be placed in." MRAD

explained that they used to hide cash inside of the door panels in vehicles that he shipped overseas to Africa, but now they are looking inside of the doors. CS-1 and MRAD discussed to whom the money was going, and MRAD thought Hamas and questioned CS-1 whether it was really for Hizballah. MRAD explained that Hizballah is bringing money into the United States. CS-1 replied that Hizballah was taking money from the United States. MRAD stated that Hizballah does not need money. He explained that Hizballah controls the airport in Beirut and that Amal controls the port of Beirut. MRAD cautioned CS-1 to be careful. "If you get caught these days, you will lose your citizenship also."

13. On or about March 31, 2010, CS-1 met with MRAD at MRAD's residence. CS-1 carried ten packages made to appear to be bundles of $10,000 each, wrapped in duct tape. MRAD assisted CS-1 in secreting what MRAD believed to be $100,000 in cash inside of a Jeep Grand Cherokee driven by CS-1. Upon arrival at MRAD's house, CS-1 was instructed by MRAD to place the Jeep Grand Cherokee into MRAD's garage. MRAD was paid $3,000 by CS-1 as partial payment for his assistance in smuggling the cash out of the United States. MRAD and CS-1 discussed whether CS-1's brother, who was receiving the vehicle when it arrived in Beirut, knew about the money secreted into the Jeep. CS-1 replied in the negative. MRAD replied "Bravo." CS-1 asked if it would be a problem if the money was going to be given to Hamas or Hizballah. MRAD says that CS-1 told him the money was going to Hamas and "[t]o Hamas, there is no problem. . . ." MRAD agrees that no one is looking at Hizballah. MRAD advises CS-1 to pretend not to know anything about Hamas, Hizballah or MRAD. MRAD suggested that the next time money is sent he will use his Volvo as the vehicle in which to hide the cash, and stated that he could hide at least $2 million in that vehicle. MRAD assured

CS-1 that when the car arrived in Lebanon, it would not be scanned for money, rather only for drugs, and only using dogs.

14. On or about April 9, 2010, in Arlington, Virginia, within the Eastern District of Virginia, CS-1 proceeded to the towing office after meeting with MRAD and giving MRAD $3,000 to complete the payment for MRAD's work smuggling money for CS-1 and for the vehicle's shipping costs. CS-1 and MRAD dealt with the office manager inside the towing office selected by MRAD. The office manager handled the shipping paperwork for CS-1's Jeep Grand Cherokee, which MRAD believed had $100,000 secreted inside, so that the vehicle could be shipped to the port of Baltimore, Maryland and thereafter to the Port of Beirut, Lebanon. CS-1 and MRAD agreed to allow the vehicle to be placed on a car carrier and transported to the Port of Baltimore by a tow truck. MRAD explained that when others known to him send money to Lebanon inside a car, they usually just have the tow truck driver transport it to the port for them. MRAD then asked CS-1 to clarify whether the money was going to Hamas or to Hizballah, to which CS-1 replied that it was going to Hizballah. MRAD then responded "I know they are for Hizballah!" CS-1 then explained that Hizballah is sending counterfeit money here and then sending real money back to Lebanon. MRAD replied "didn't I tell you" that the best counterfeit [printing machines] are in Lebanon? MRAD then advised that the next time they could use his Jaguar to hide money inside. MRAD admonished CS-1 to ask for more money the next time because the fee of 10% of the value of the cash being smuggled was not enough. "No one will settle for ten. Trust me no one will settle for 10%." MRAD stated that this amount of money, $100,000, was not a joke and was not without risk.

15. On or about May 20, 2010, CS-1 met with MRAD at MRAD's residence. MRAD

asked CS-1 whether the car that they had shipped to Lebanon had arrived and had been retrieved by CS-1's brother. CS-1 responded in the affirmative.

16. On or about February 3, 2012, a second paid FBI confidential source, CS-2, meet with MRAD at a local restaurant in Fairfax, Virginia. MRAD asked CS-2 what CS-2 was doing now for work. CS-2 answered that CS-2 had seven cars stuck at the port of Baltimore and that the government had frozen CS-2's accounts. CS-2 added that CS-2 is stuck with a half million dollars that I need to send. At this point MRAD began to run his hands under CS-2's collar and shirt seams to determine whether CS-2 was wearing a wire (covert listening device). CS-2 and MRAD continued to discuss individuals with whom they had conducted business. MRAD then went on to state that we've placed money inside cars for Hizballah with two Shiite guys who are friends of ours, for 10%. MRAD then warned CS-2 that a lot of people are recording stuff and are informants these days.

19. This affidavit is submitted in support of a criminal complaint and application of an arrest warrant for MUFID "Mark" MRAD. Based also upon the above information, I respectfully submit there is probable cause to believe that MRAD has committed criminal violations of 18 U.S.C. 1956 (a)(2) and 31 U.S.C. 5332.

*/s/ Peter W. Ashooh*
Peter W. Ashooh
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 30th Day of May, 2012.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

Theresa C. Buchanan
United States Magistrate Judge
Alexandria, Virginia